# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00830-COA

**JACOB BLAIR SCOTT**                                                        **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                      **APPELLEE**

DATE OF JUDGMENT:              06/03/2022
TRIAL JUDGE:                  HON. KATHY KING JACKSON
COURT FROM WHICH APPEALED:     JACKSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                              BY: MOLLIE MARIE McMILLIN
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                              BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:             ANGEL MYERS McILRATH
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 06/11/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., GREENLEE AND McDONALD, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.     After sexually abusing his fourteen-year-old stepdaughter, Jacob Scott was convicted in the Jackson County Circuit Court of four counts of touching a child for lustful purposes, nine counts of sexual battery, and one count of exploitation of a child.  The circuit court sentenced Scott to fifteen years for each conviction of touching a child for lustful purposes, thirty years for each conviction of sexual battery, and forty years for his exploitation of a child conviction.  The circuit court ordered Scott's sentences for lustful touching to run concurrently with each other and his sentences for sexual battery to run concurrently with each other and consecutively to his sentences for lustful touching and exploitation of a child,

for a total of eighty-five years in the custody of the Mississippi Department of Corrections to be served day-for-day without eligibility for parole.

¶2. After the denial of his post-trial motion, Scott appealed. On appeal, Scott claims that the circuit court erred by denying his motion for a change of venue. Finding no reversible error, we affirm Scott's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶3. In November 2016, forty-year-old Scott began sexually abusing his fourteen-year-old stepdaughter, Jane.[1] Jane became pregnant and then disclosed to her half-sister and brother-in-law that she had been sexually abused by Scott. The next day, on March 5, 2017, Jane's half-sister and brother-in-law took Jane to the Jackson County Sheriff's Office to report the abuse. After a forensic interview, Jane had a physical examination and was administered a pregnancy test, which revealed that she was, in fact, pregnant. Jane was also placed in the custody of Child Protection Services (CPS).

¶4. Sergeant Edward Clark with the Jackson County Sheriff's Office called Scott and informed him that Jane was at the emergency room and that he and Jane's mother needed to come to the hospital. Without asking any questions, Scott said that they were on the way. When Jane's mother arrived at the hospital by herself, she explained that she left Scott at a gas station because he started crying on the way to the hospital, admitted to doing bad things with Jane, and said that he was going to go to jail. Law enforcement found Scott at the gas station and arrested him.

---

[1] We use pseudonyms to protect the identity of the victim.

¶5.     Subsequently, Lieutenant Kristen Johnson with the Jackson County Sheriff's Office interviewed Jane's mother. Jane's mother indicated that she had been taking medication for pain. And it was Lieutenant Johnson's understanding that "the medications made her sleep, so she did not know how often or exactly when Scott would come to bed or basically what was going on in the house." Jane's mother also could not remember if Scott had ever asked for permission to sleep in Jane's room. Jane's half-sister later said that she had confronted their mother about Scott coming out of Jane's bedroom and other suspicious behaviors, but Jane's mother did not seem to recall this either.

¶6.     Sergeant Sherwood Beckham performed a physical extraction of Scott's Samsung cell phone data and a logical extraction of Jane's iPhone data. Sergeant Beckham found images of sexual abuse that had been deleted but retained on Scott's cell phone. The photographs apparently depicted Scott sexually abusing Jane with his fingers, hands, and a "device." Sergeant Beckham also found text messages between Scott and Jane about Jane's pregnancy and fixing the situation with pills. Finally, Sergeant Beckham found an "Abortion FAQs" PDF on Scott's cell phone and an article titled "Stepfather Confesses to Child Molestation" that had been viewed on Scott's cell phone several days before the abuse was reported.

¶7.     In September 2017, Scott was charged with four counts of touching a child for lustful purposes, nine counts of sexual battery, and one count of exploitation of a child. The circuit court subsequently entered an order setting bail. In 2018, Scott failed to appear in court, and a bench warrant was issued for his arrest. Scott was later suspected of faking his own death and was placed on the U.S. Marshal's "15 Most Wanted Fugitives" list. In January 2020,

3

Scott was apprehended in Oklahoma.

¶8.     After Scott's case was reinstated to the circuit court's active docket, he filed a motion for a change of venue in November 2020, and a hearing was held on the motion. Scott asserted that he could not receive a fair trial by an impartial jury in Jackson County due to media coverage of the case and threats of violence. Scott attached two affidavits to his motion and later submitted eleven additional affidavits in support of his motion.[2] Scott also submitted printouts of Google search results of his name and Google image results of his name, Facebook posts and comments, and copies of news articles containing facts about the case and the events surrounding his abscondment and eventual arrest.

¶9.     In response, the State asserted that only four of the Google search results and thirty-two of the Google image results pertained to Scott. With respect to the Facebook posts, the State argued that Scott had not shown that any of the comments were posted by residents of Jackson County. And with respect to the news articles, the State asserted that they were outdated. According to the State, Scott's case received similar media coverage as factually similar cases with the exception of the media coverage about his abscondment.

¶10.    The State also argued that Scott's affidavits were biased because the affiants were either Scott's family members or friends of his family.[3] The State suggested that the circuit

_____

    [2] Later, defense counsel proffered that Jane's half-sister would amend the affidavit that she submitted by adding that she had been rejected, humiliated, and made fun of as a result of the case, that it had hurt her at her job, and that people had seen coverage on the local news.

    [3] During a pretrial hearing, Justin Grafton, the chief investigator for the District Attorney's Office, testified that he had spoken with some of the individuals who submitted affidavits on Scott's behalf about their knowledge of the case. According to Investigator

court should consider completed questionnaires instead of the affidavits. The court had previously summoned a jury for the purpose of empaneling a new grand jury. After the grand jury was selected, members of the venire who were not selected had the option of completing a questionnaire regarding their knowledge of Scott, Scott's case, and which media outlets they followed. According to the State, thirty-nine residents of Jackson County participated. Of all the participants, twenty-nine Jackson County residents said that they did not know Scott, and twenty-four Jackson County residents said that they had not heard of a criminal case in which a man was alleged to have sexually abused his stepdaughter, faked his death, and fled the state. Ultimately, thirty-five Jackson County residents indicated that they could be fair and impartial; however, two questionnaires were not notarized. Three Jackson County residents indicated they could not be fair and impartial, and one Jackson County resident did

---

Grafton, Shellie Carter, who knew Scott's mother, did not remember Scott's case until she was presented with her signed affidavit. Investigator Grafton believed that she was biased because her son also had legal issues, and she indicated that her son had been wronged by Harrison County. Archie Williams (Scott's uncle) and his wife Gina both signed affidavits. Archie did not believe that Scott could receive a fair trial in Jackson County because of politics and the judge, and he stated that he thought a male judge would be more fair "because a male judge would understand." Archie also recalled an incident when a Walmart employee asked him if he had heard that "they caught that guy." Roger Williams (Scott's uncle) and his wife Susan also signed affidavits. Susan said that she had read information about the case on Facebook and had seen coverage in the local news. Marshall Scott (Scott's uncle) and his wife Elizabeth Scott signed affidavits. Marshall said that he had heard information about the case on the local and national news. Lilly Johnson (Scott's aunt) said that she had heard information about the case through family members and on TV. Laura Wittington Porter (Scott's cousin) noted that Scott's case had been widely publicized, and Rebecca Vice (Scott's cousin) believed that people in the community had already made up their minds about the case. Finally, Cara Poole (Scott's cousin) seemingly believed Scott could have a fair trial in another county, and she acknowledged that the case had not been discussed as much anymore. Investigator Grafton was not able to speak with Linda Scott (Scott's aunt) or Patricia Porter (Scott's aunt) about their affidavits.

not indicate either way.

¶11.    Investigator Grafton assisted with the questionnaire process, and he did not believe that the community had prejudged Scott's case. Additionally, Investigator Grafton had not heard about any threats on Scott's life and did not believe that there was a sentiment in the community to harm Scott. Ultimately, Investigator Grafton believed that Scott could receive a fair and impartial trial in Jackson County.

¶12.    The circuit court denied Scott's motion for a change of venue in September 2021—several months before Scott's trial. The circuit court found that only six social media posts could be considered threatening. Further, the circuit court found that the State rebutted the presumption for a venue change with the questionnaires, which were completed by Jackson County residents who did not have any familial connection or friendship with Scott.[4]

¶13.    At trial, Scott admitted to having sex with Jane when she was fourteen years old. Specifically, Scott admitted to putting his penis and fingers in Jane's vagina and giving her "morning-after" pills, and he acknowledged that Jane had become pregnant with his child.[5] Although Jane testified that Scott also performed oral sex and suggested that he used a vibrator on her, Scott denied these claims. Scott testified, "I know she couldn't consent. I didn't start it." He claimed he told Jane to stop but testified that she was aggressive. According to Jane, she did not want any of this to happen, Scott threatened to hurt her family, and she did not feel safe telling anyone.

---

[4] Before the trial began, Scott renewed his motion for a change of venue, and the circuit court stated, "We're going to do voir dire and see how it goes."

[5] DNA testing showed that the probability of paternity was 99.9998 percent.

6

¶14. After considering the evidence presented at trial, the jury convicted Scott of four counts of touching a child for lustful purposes, nine counts of sexual battery, and one count of exploitation of a child. The court sentenced Scott, and he appealed.

**DISCUSSION**

¶15. We must decide whether the circuit court erred by denying Scott's motion for a change of venue. "A change of venue is at 'the discretion of the trial court, and its ruling thereon will not be disturbed on appeal unless it clearly appears that there has been an abuse of discretion or that the discretion has not been justly and properly exercised under the circumstances of the case.'" *Davis v. State*, 196 So. 3d 194, 198 (¶17) (Miss. Ct. App. 2016) (quoting *Beech v. Leaf River Forest Prods.*, 691 So. 2d 446, 448 (Miss. 1997)). "Where the evidence is conflicting on the question of whether or not the defendant could receive a fair and impartial trial, an appellate court will generally defer to the considered opinion of the trial court." *Id.* (quoting *Burrell v. State*, 613 So. 2d 1186, 1190 (Miss. 1993)).

¶16. "Under Mississippi law, upon a proper application for a change of venue a presumption arises that an impartial jury cannot be obtained." *Id.* at 198 (¶18) (quoting *Stewart v. State*, 29 So. 3d 12, 14 (¶6) (Miss. Ct. App. 2008)). "A proper application for change of venue is made by making a motion supported by the affidavits of two or more witnesses in conformance with the requirements of Mississippi Code Annotated section 99-15-35." *Id.* This section states:

> On satisfactory showing, in writing, sworn to by the prisoner, made to the court, or to the judge thereof in vacation, supported by the affidavits of two or more credible persons, that, by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and

7

impartial trial in the county where the offense is charged to have been committed, the circuit court, or the judge thereof in vacation, may change the venue in any criminal case to a convenient county, upon such terms, as to the costs in the case, as may be proper.

Miss. Code Ann. § 99-15-35 (Rev. 2015). The presumption may be rebutted. However, "our supreme court has identified several factors that, when present, make the presumption for a change of venue irrebuttable." *Davis*, 196 So. 3d at 198 (¶18). The factors follow:

(1) Capital cases based on considerations of a heightened standard of review;

(2) Crowds threatening violence toward the accused;

(3) An inordinate amount of media coverage, particularly in cases of

    (a)    serious crimes against influential families;

    (b)    serious crimes against public officials;

    (c)    serial crimes;

    (d)    crimes committed by a black defendant upon a white victim;

    (e)    where there is inexperienced trial counsel.

*Id.*

¶17. "In reviewing whether the trial court abused its discretion in denying a change of venue, 'we look to the completed trial, particularly including the voir dire examination of prospective jurors, to determine whether the accused received a fair trial.'" *Id.* at 198-99 (¶19) (quoting *Lutes v. State*, 517 So. 2d 541, 546 (Miss. 1987)).

¶18. At the hearing on the motion for a change of venue, the State noted that the motion was not sworn to by the prisoner. The prosecutor stated, "[B]ecause we know they can just

8

re-file and correct it and we don't want to delay, we're just putting that on the record as an observation of its procedural failure." Despite the procedural issue being raised, it does not appear that Scott ever refiled the motion. "An application for a change of venue must conform strictly to [the] statute." *Smith v. State*, 981 So. 2d 1025, 1033 (¶39) (Miss. Ct. App. 2008) (citing *Baldwin v. State*, 732 So. 2d 236, 241 (¶10) (Miss. 1999)). Because Scott's motion was not "sworn to by the prisoner," Scott failed to comply with the statute.

¶19. Notwithstanding any procedural bar, this issue has no merit because the judge was within his discretion in refusing the request for a change of venue. Prior to trial, Scott asserted that the presumption that an impartial jury could not be obtained was irrebuttable. As noted by the circuit court, crowds threatening violence toward the accused was the only applicable factor. However, the circuit court found that only six posts could be considered threatening, and Scott did not show that any of the comments were posted by Jackson County residents. Additionally, Investigator Grafton testified during a hearing that he had not heard about any threats on Scott's life, and he did not believe that there was a sentiment in the community to harm Scott. For these reasons, we cannot say that the circuit court abused its discretion by finding that the presumption was not irrebuttable.

¶20. Our criminal rules state, "Whenever the grounds for change of venue are based on pretrial publicity, the trial judge shall consider the level of adverse publicity (both in extent of coverage and its inflammatory nature) and the potential effect of such publicity on the venire." MRCrP 11.1(b). Here, the circuit court considered the Google results, Facebook posts and comments, and news articles that Scott submitted. Additionally, the circuit court

considered the affidavits that Scott submitted in support of his motion for a change of venue. However, the circuit court found that the questionnaires that were completed by Jackson County residents suggested that a fair and impartial jury could be had. Of the thirty-nine participants, twenty-nine Jackson County residents said that they did not know Scott, and twenty-four Jackson County residents said that they had not heard of a criminal case in which a man was alleged to have sexually abused his stepdaughter, faked his death, and fled the state. Additionally, thirty-five Jackson County residents indicated that they could be fair and impartial, though two of the questionnaires were not notarized. We cannot say that the circuit court abused its discretion when it found that the State had rebutted the presumption that an impartial jury could not be obtained in Jackson County.

¶21. Finally, a review of the record shows that Scott received a fair trial by an impartial jury. For these reasons, we find that the circuit court did not abuse its discretion by denying Scott's motion for a change of venue. Therefore, we affirm Scott's convictions and sentences.

¶22. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. LAWRENCE, J., NOT PARTICIPATING.**

10